UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ROBERT BENDUS, GERALD BROWN,
JOE CALLAHAN, MELVIN JOHNS, and
GEORGE WILLIAMS,

       Plaintiffs,

v.                                    3:10cv464-WS

MICHAEL B. DONLEY,
SECRETARY OF THE AIR FORCE,

       Defendant.

_____

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

The plaintiffs in this case sue their former employer, the United States Department of the Air Force (the "Air Force" or "DAF"), seeking relief under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634, the Back Pay Act, 5 U.S.C. § 5596, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219. Before the court at this time is the Air Force's motion to dismiss or, in the alternative, motion for summary judgment. Doc. 70. The plaintiffs have responded (doc. 74) in opposition to the motion, and the parties have been advised (doc. 81) that the Air Force's motion, treated as a motion for summary judgment, would be taken under advisement as of a date certain.

I. <u>BACKGROUND</u>

At all relevant times, the five plaintiffs were civilian federal employees who worked as supervisory police officers at the 96th Security Forces Squadron ("96th SFS") at Eglin Air Force Base ("Eglin AFB"). Operationally, the 96th SFS was organized into three eight-hour shifts. Civilian police officers within a shift were supervised by a shift supervisor, who in turn was supervised by a shift commander, who in turn was supervised by the chief.

Joe Callahan, Melvin Johns, and George Williams were salaried shift supervisors, each having supervisory authority over approximately a dozen civilian police officers within a shift. Robert Bendus was a salaried shift commander who supervised the shift supervisors and who—as well—was responsible for all of the security guards and police officers assigned to his shift. Gerald Brown was the salaried chief of the civilian police and security guards. As chief, Brown had supervisory authority over all shift commanders and civilian law enforcement officers in the 96th SFS. In addition to their supervisory duties, each of the plaintiffs was expected to perform normal law enforcement duties as needed. According to their personnel records, the five plaintiffs were classified as exempt employees for Fair Labor Standards Act purposes. None of the plaintiffs was a union member or bargaining unit employee. In 2010, Callahan, Johns, Williams, and Brown were over sixty years of age while Bendus was over fifty.

On July 9, 2007, the Department of Defense ("DOD") issued Instruction 5210.90 (the "Instruction"), which set forth DOD policy with regard to minimum training, certification, and physical fitness standards for civilian police officers and security

guards in the DOD.  Among other things, the Instruction directed the secretaries of all

military branches, including the Air Force, to

> [e]stablish minimum performance-based physical fitness standards for
> CP/SGs [civilian police/security guards] that are based on occupational
> tasks.  Accepted tests will include anaerobic and aerobic endurance,
> agility, and strength.  These standards should be based on current
> physical fitness tests accepted by the law enforcement community.  Tests
> will be conducted on a regular recurring basis (at least annually).

The Instruction also directed the military branches to implement physical fitness

standards for "all CP/SG members of their Component in accordance with the multi-

Service regulation."  The Instruction was effective immediately, with implementation

subject to each military department's development of suitable standards and satisfaction

of bargaining obligations for bargaining unit employees.

As directed, staff at Air Force Headquarters immediately began to develop

physical fitness policies and standards for civilian police officers and security guards.

On January 7, 2008, Brigadier General Mary Kay Hertog, then Director of the Air Force

Security Forces Directorate, issued a memorandum to all major commands, setting forth

the physical fitness standards to be applied to new hires.  Hertog explained:

> 4.  The AF adopted the job related fitness/agility standards which are in
> use by the Army for their civilian police and security guard program.
> These standards were developed by the Army Physical Fitness School
> and are consistent with standards developed and validated for the leading
> civilian police agencies.
>
> 5.  There will be no waivers for fitness standards, or weapons qualification
> standards.  These standards are designed to ensure that employees can
> perform the essential functions of the civilian police and security guard
> positions, and can do so in a safe and effective manner without posing a
> risk to themselves, others or the law enforcement mission.

As set forth in an attachment to Hertog's memorandum, the Air Force adopted a

Physical Agility Test ("PAT") containing four components to be used immediately for new hires into CP/SG positions.  Specifically, it was determined that applicants for CP/SG positions must run 1.5 miles in 17.5 minutes, execute 21 pushups in two minutes, execute 29 sit-ups in two minutes, and sprint 300 meters in 81 seconds, all in order to demonstrate the cardio-respiratory endurance, upper body muscular strength, core abdominal muscular strength, and anaerobic capacity needed for self-defense, for use-of-force situations, for foot pursuits, for rescues, and for high intensity arrests.

With respect to incumbents, Hertog noted that the Air Force expected to complete appropriate policies for existing employees later in January 2008.  She added that "[e]ach policy that impacts current civilian employees must first be provided to the unions with national union consultation rights, and then negotiated at installation level with the applicable unions."

The Air Force policy letter setting forth the newly-adopted PAT for CP/SG applicants was provided to the union, AFGE Council 214 (the "Union"), on January 5, 2009.  On January 26, 2009, Randy Shaw, Chief of Labor & Employee Management Relations for Air Force Material Command, notified the Union that, for incumbent term employees hired pursuant to Global War on Terrorism ("GWOT") authority, the estimated PAT-implementation date was September 2009.  Shaw stressed that, while such incumbent bargaining-unit employees were not currently being held responsible for adhering to the same physical fitness standards as the new employees, ultimately "all police and security guards positions [would be] required to adhere to these standards."

Shaw's January 2009 notice to the Union initiated the formal bargaining process with respect to the PAT standards for GWOT term employees.  On February 11, 2009,

the Air Force was notified that the Union had no issues to bargain with respect to GWOT employees and that Eglin AFB could accordingly "prepare for implementation" of the standards in September of 2009 or six months after employee notification.

In September 2008, Lieutenant Colonel Scott M. Foley took command of the 96th SFS at Eglin AFB.  In that capacity, Foley was responsible for all base activities and personnel, including civilian personnel.  When he arrived at Eglin, Foley was well aware that the Air Force was in the process of establishing and implementing—subject to bargaining obligations—physical fitness standards for all civilian police officers and security guards at Eglin and elsewhere.  By email dated February 20, 2009, Lieutenant Colonel Jeffrey G. Branting, Chief of Security Forces Division, Installations and Mission Support, informed Foley that implementation of the PAT had been authorized for bargaining-unit employees hired under GWOT authority, with the following condition:

> [B]argaining unit employees hired prior to implementation of the standards [must have] a period of six months, approximately September 2009, to adhere to Air Force standards.  This additional time allows current employees to prepare for the physical fitness and medical requirements. In all circumstances, employees should be provided the full six months from date of notification.

On March 17, 2009, a shooting incident occurred at Eglin AFB.  Although civilian police officers were among those who responded to the incident, two military police officers ultimately shot and apprehended the suspect.  Based on his own observations, Foley concluded that some of his civilian police officers were so out of shape that "they could not run and catch a bad guy if their life depended on it."

Following the March shooting incident, an independent Use of Force Review Committee was convened by Colonel Brady Wrights, the top police officer of the Air

Force Special Operations Command (outside of Foley's chain of command), to review Eglin's response to the shooting incident. The Review Committee concluded that, had the suspect fled into the woods, the civilian police officers "could not have safely participated in the search and apprehension of the suspect because of their lack—apparent lack of physical readiness." As part of its review, the Review Committee recommended that Foley hold his civilian police officers "to some level of physical readiness approaching that of his active duty force."

Based on his own observations as well as those of the Use of Force Review Committee, Foley concluded that it was important for the new physical fitness standards to be implemented and enforced for *all* civilian police and security guards at Eglin, not just new applicants and term employees hired pursuant to GWOT authority. Foley's main concern was focused on 33 bargaining-unit police officers—almost all of whom were vets, including many who were 30-percent disabled vets—who were not term employees hired pursuant to GWOT authority but were permanent employees with tenures of more than eight years.

In April 2009, Foley briefed all GWOT security guards about the new conditions of employment to become effective on January 1, 2010. The 33 permanent police officers were not included because the bargaining process was not complete as to those individuals. The compliance deadline for GWOT guards was later extended to April 1, 2010.

In September 2009, Foley met with Civilian Personnel to discuss whether Eglin's incumbent supervisory police officers, including the five plaintiffs here, could be required to comply with the new physical fitness standards. Because the supervisory police

officers were not bargaining-unit employees, Foley felt that there was no reason to

refrain from requiring supervisors to meet the same conditions of employment expected

of applicants and those employees who were hired under GWOT authority.  In October

of 2009, having been advised that it would be appropriate for him to require supervisory

police officers to comply with the PAT, Foley briefed his supervisory police and security

guards on the new standards, including fitness standards.  He set April 1, 2010, as the

deadline for compliance.

On March 25, 2010, just days before the deadline for compliance, Foley

participated in a telephonic meeting with (1) attorneys from both the Air Force Labor

Law Field Support Center and the legal office on Eglin AFB; (2) DAF Civilian Police

Program Manager, Raul Rodriquez, whose office at Lackland AFB provides policy and

guidance in force protection matters; and (3) other representatives from a number of

different offices, including two higher headquarters elements in Foley's chain of

command, namely, AF/A7S (Security Forces Directorate in the Pentagon) and

AFMC/A7S (Security Forces Division, Installations and Mission Support).  All present

during the telephone conference concurred with Foley's plan to implement the physical

fitness standards for supervisory police officers.

By April 1, 2010, with the exception of the thirty-three police officers whose

adherence to the standards could not be required by virtue of their status as permanent

bargaining-unit employees, the physical fitness standards were implemented for all

other civilian police officers and security guards at Eglin, including supervisory police

officers.  None of the five plaintiffs in this action attempted to take the PAT.

Knowing that they would not be able to complete the PAT, Johns and Brown

retired on or before the April 1, 2010, compliance deadline.  Bendus was relieved of his

police responsibilities, his badge, and his firearm in September of 2009 pending

investigation into allegations of conduct unbecoming an officer.  After completing its

investigation into the allegations of misconduct, the Air Force notified Bendus that,

effective on May 14, 2010, he would be removed from federal service for conduct

unbecoming a police officer.  Williams and Callahan were relieved of their police

responsibilities on April 1, 2010, but were given the opportunity to work in other

positions while they sought medical documentation to support delayed compliance with

the PAT.

In June 2010, Foley completed his tour at Eglin AFB and took command at

Langley AFB.  Williams and Callahan were still employed by the Air Force when Foley

left Eglin.

On August 5, 2010, Brigadier General Jimmy E. McMillian, Director of Security

Forces at Air Force Headquarters, issued a memorandum that was intended to provide

"clarifying guidance" for all DAF civilian security forces personnel, including lead and

supervisory personnel.  Among other things, McMillian wrote:

> The Air Force views the fitness/agility standards as an essential
> requirement for continued employment as a police officer or security
> guard.  Recent events at Fort Hood and at several Air Force installations
> require that we quantify our existing expectations of the ability of our force
> to respond to the full spectrum of duties, without warning, under duress,
> without risk to themselves or others.

McMillian stressed that the Air Force's PAT policy—consisting of four events (1.5 mile

run, 300-meter sprint, sit-ups and push-ups)—applied to *all* civilian security force

personnel, including supervisors.  Recognizing that collective bargaining obligations

might still need to be met in some locales, McMillian provided a 180-day deadline.  In

McMillian's words:

> All civilians who wish to perform as police or security guards must pass
> the PAT within 180 days of the signature of this letter.  Waivers for an
> additional 180 days must be addressed by MAJCOM A7S to AF/A7S for
> consideration, and include a mitigation strategy if it is known that
> personnel cannot respond to the full range of their duties.

Williams and Callahan were unable to complete the PAT within the 180-day period set

by McMillian.  There is no evidence to suggest, moreover, that either Williams or

Callahan applied for a waiver.  In lieu of being terminated, Williams and Callahan chose

to retire in February and March of 2011, respectively.  Having left Eglin in June 2010,

Foley had no involvement in the events and decisions affecting Williams and Callahan in

the months leading to their retirements.

## II.  FLSA CLAIMS

In Count II of their first amended complaint, the five plaintiffs seek relief under the

FLSA for uncompensated work performed while they were on standby status.  In

particular, they claim that they were required to remain in their homes ready to respond

within six rings of their home telephones over a period of approximately four weeks.

During that time, they were allegedly prevented from having the freedom to attend to

personal concerns.

In fact, on November 8, 2009, the intensity and direction of Hurricane Ida caused

Foley to declare HURCON 3 for Eglin AFB.  All security forces personnel—including the

plaintiffs in this action—received an email putting them on six-ring standby because of

the anticipated hurricane conditions.  The email contained the following bullets:

- Personnel shall be contactable at all times.• Have an

> alternate number where your unit can reach you during a recall; let your supervisor know.
> • Don't go hunting, camping or out of town if you are on six-ring alert.
> • Note, even having a cell phone with you is no guarantee of contactability.
> • Don't forget, on six-ring standby, you may be called in to work at a moment's notice, therefore—no consumption of alcohol.

According to Foley, it is standard operating procedure for a six-ring standby to be over when the event passes, which means that—in this instance—the six-ring standby ended when the threat of Hurricane Ida passed in a matter of days.  The plaintiffs, on the other hand, maintain that they were kept on six-ring standby status until December 4, 2009, when—prompted by their complaints about the extended standby period—an email notice was sent stating that the standby period had ended.

Section 207 of the FLSA sets a forty-hour workweek and requires employers to pay their employees one-and-one-half times their usual hourly wage for every hour worked over forty in any given week.  29 U.S.C. § 207(a)(1).  Section 213 exempts all employees "employed in a bona fide executive, administrative, or professional capacity" from the maximum hour and overtime provisions of section 207.  Id. § 213(a)(1).  The Air Force maintains that all five of the plaintiffs were exempt executive employees who were not entitled to overtime pay under the FLSA.

OPM regulations describe an "executive" as an employee (1) whose primary duty is management; (2) who regularly directs the work of two or more employees; and (3) whose "suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees, are given particular weight."  29 C.F.R. § 551.205(a).  The Air Force has the burden of establishing that the

executive exemption applies to the plaintiffs.

The Air Force has attached to its motion for summary judgment (1) personnel documents reflecting that all five plaintiffs were designated as exempt employees for FLSA purposes; and (2) position descriptions reflecting that all five plaintiffs satisfied the executive exemption criteria set forth in section 551.205(a) of the OPM regulations. In response, the plaintiffs have produced neither evidence nor argument to refute the Air Force's properly-supported arguments regarding the plaintiffs' exempt status. The Air Force is accordingly entitled to summary judgment with regard to the plaintiffs' FLSA claims.

Even if they were not exempt employees, the plaintiffs would still be ineligible for overtime pay because their standby hours were not compensable under the FLSA. To be sure, when "employees are engaged to wait for the employer's call to duty, this time may be compensable under the FLSA." Birdwell v. City of Gadsden, Ala., 970 F.2d 802, 807 (11th Cir. 1992). Whether time spent on standby qualifies as work hours for FLSA purposes depends on "the degree to which the employee may use the time for personal activities," which—in turn—depends upon all of the facts and circumstances of the case. Id. It is for the court to decide whether a particular set of facts and circumstances gives rise to liability under the FLSA. Id.

The matter of standby time is addressed in the Code of Federal Regulations provides as follows:

(a)(1) An employee is on duty, and time spent on standby duty is hours of work if, for work-related reasons, the employee is restricted by official order to a designated post of duty and is assigned to be in a state of readiness to perform work with limitations on the employee's activities so substantial that the employee cannot use the time effectively for his or her

own purposes.  A finding that an employee's activities are substantially limited may not be based on the fact that an employee is subject to restrictions necessary to ensure that the employee will be able to perform his or her duties and responsibilities, such as restrictions on alcohol consumption or use of certain medications.

(b) An employee will be considered off duty and time spent in an on-call status shall not be considered hours of work if:

> (1) The employee is allowed to leave a telephone number or to carry an electronic device for the purpose of being contacted, even though the employee is required to remain within a reasonable call-back radius.

5 C.F.R. § 551.431(a)(1), (b)(1).

In Birdwell, 970 F.2d at 810, the Eleventh Circuit stressed that "an employee's free time must be severely restricted for off-time to be construed as work time for purposes of the FLSA."  In that case, all plain clothes detectives in Gadsden, Alabama, were on-call for a week while non-law-enforcement employees of the city were on strike. Although the detectives were not required to stay at the police station during their off-duty time, they could not leave home unless they left a forwarding number or owned a beeper.  They could not go fishing or hunting, leave town, go on vacation, or drink alcohol.  Despite these restrictions, the Eleventh Circuit found that the detectives' on-call time was not used predominately for the employer's benefit and, therefore, was not compensable under the FLSA.

Much like the detectives in Birdwell, the police officers here were not required to stay on base during their off-duty time but were allowed to be at home where—so long as they were contactable and refrained from consuming alcohol—they were free to sleep, eat, watch television, entertain guests, do household chores, and engage in a myriad of other activities predominantly for their own benefit.  They were not required to

perform any work at home.  Because Hurricane Ida—the event that triggered the six-

ring standby—quickly passed through the Eglin area without serious damage, none of

the plaintiffs was called in for duty.  Indeed, three of the plaintiffs were permitted to take

annual, sick, or administrative leave during the month they spent "essentially on house

arrest."  Under the circumstances, the court finds that the plaintiffs in this case—like the

plaintiffs in Birdwell—were able to use their standby time predominantly for their own

benefit and so were not "working" for purposes of the FLSA.

## III.  ADEA CLAIMS

A.  Exhaustion of Administrative Remedies

In Count I of their first amended complaint, the five plaintiffs assert claims under

the ADEA and the Back Pay Act.[1]  Among other things, the Air Force continues to

assert that the plaintiffs failed to exhaust their administrative remedies and so are

barred from pursuing their ADEA and Back Pay Act claims in federal court.[2]  As

correctly noted by the Air Force, if federal employees fail to follow the administrative

procedures set forth in the ADEA and relevant regulations, they cannot pursue a federal

court action seeking relief under the ADEA and the Back Pay Act for alleged age

discrimination.

The ADEA provides two ways for federal employees to assert claims of

---

[1] Because the record evidence establishes that Bendus was removed from the
Air Force for conduct unbecoming a police officer and not because of his age, Bendus's
Count I claim did not survive the Air Force's earlier-filed motion for summary judgment.

[2]  The Air Force unsuccessfully raised the failure-to-exhaust issue in its previous
motion for summary judgment.  The Air Force has now provided additional evidence
and—in effect—has asked the court to reconsider its earlier decision.

discrimination.  29 U.S.C. § 633a.  One alternative is for the employee to pursue

administrative remedies with the Equal Employment Opportunity Office ("EEO") of the

federal agency.  As a second alternative, the employee may proceed directly to federal

district court provided he or she has first given the Equal Employment Opportunity

Commission ("EEOC") at least thirty days' notice of an intent to file such an action and

provided such notice is filed with the EEOC within 180 days after the alleged

discriminatory action occurred.  In this case, there is neither allegation nor evidence to

suggest that any of the plaintiffs pursued the second alternative to assert their claims of

age discrimination.

The administrative review requirements for asserting ADEA claims are set forth

in 29 C.F.R. § 1614.101-.607, and include, *inter alia*, (1) § 1614.105(a)(1), requiring the

employee to seek informal resolution of any occurrence of discrimination by consulting

with a counselor in the employing agency's personnel department within 45 days of the

alleged occurrence of discrimination; and (2) § 1614.105(d), requiring the counselor to

conduct a final interview with the aggrieved employee within 30 days of the date the

employee contacted the agency's EEO to request counseling and—if the matter has not

been resolved—to issue not later than the thirtieth day a written notice of the

employee's right to file a formal administrative complaint.

Charles Hunt, Chief of the Human Relations Division at Eglin AFB, explained the

Air Force's informal pre-complaint process—the process set forth in 29 C.F.R. §

1614.105—as follows:

> 3.  At Eglin AFB, employees may see an EO counselor for the purpose of
> making initial contact on a walk-in basis or by appointment.

4.  At this initial contact, employees complete a form, entitled "RECORD OF INITIAL CONTACT."

5.  On the form, a complainant may pick one of four reasons for their visit: "For INFORMATION ONLY," "Establish INITIAL contact within 45 days of event," "File an INDIVIDUAL PRE-COMPLAINT," or "File a CLASS COMPLAINT."

6.  The primary function of the initial contact meeting is to permit complainants to comply with the forty-five day time limit for initial contact specified in Section 1614.105(a).

7.  At the initial contact meeting, the counselor will explain the EO process, including the requirements that complainants who wish to proceed with the pre-complaint process gather specific information regarding the alleged discriminatory incident and return to file a pre-complaint of discrimination.

8.  Although not required at this stage in the process, the EO counselor also provides every complainant with notice of his or her rights at the initial contact meeting.

. . . .

11.  After an aggrieved employee has gathered the relevant information and made the decision to proceed with counseling, the employee must fill out a pre-complaint form and meet with a counselor for an initial counseling session.

12.  The pre-complaint form asks the complainant to select the process the complainant is requesting: either ADR or the EO counseling process.

13.  When the complainant selects the EO counseling process, the thirty-day counseling period begins, and the counselor must frame the issue(s) in a written statement and attempt to resolve the issue(s).

. . . .

15.  If an aggrieved employee makes initial contact, can provide all required information, has decided to move forward with the EO counseling process, and has sufficient time to stay at the EO office, the employee may complete the initial contact and initial counseling session in one meeting.

16.  Often, employees are not ready to begin initial counseling because of

time constraints or the need to think through the specifics of their
allegations before filing their pre-complaint.

The pre-complaint process required by the regulations and employed by the Air

Force thus includes (1) initial contact with an EEO counselor, (2) the filing of a pre-

complaint with specific information regarding the alleged discriminatory incident, (3)

informal counseling, (4) a final interview, and (5) if the matter has not been resolved,

issuance of a notice informing the complainant of the right to file a formal discrimination

complaint. Morales–Vallellanes v. Potter, 605 F.3d 27, 31 n. 3 (1st Cir. 2010) (noting

that "[t]he EEO complaint process . . . requires the employee to file a 'precomplaint' and

consult with an EEO counselor").  A complainant's failure to comply with the required

administrative pre-complaint procedures causes him or her to lose the right to pursue a

later action in court.  See Walton v. Dalton, No. 96-1408, 1997 WL 123129, at *2 (4th

Cir. Mar. 19, 1997) (noting that, if a complainant fails to provide the EEO counselor with

specific information regarding the alleged discrimination, thus preventing the defendant

from adequately investigating the charges, the complainant has thereby failed to

exhaust his administrative remedies); Gardiner v. Gonzales, No. 04-60104, 2006 WL

1109247, at *4 (E.D. Mich. Apr. 24, 2006) (noting that "[m]ere contact with an EEO

counselor does not satisfy the exhaustion standard").

The record evidence establishes that Melvin Johns retired from the Air Force on

February 28, 2010.  He made initial contact with the Air Force's EEO on June 10, 2010,

more than 45 days after he retired.  The Air Force contends that the evidence thus

establishes that Johns failed to initiate the administrative pre-complaint process within

the required time limit, thereby entitling the Air Force to dismissal of Johns's ADEA

claim for failure to exhaust.  Because Johns has submitted neither evidence nor argument to counter the Air Force's contention, Johns cannot proceed with his ADEA claim in this court.

Callahan made initial contact with the Air Force's EEO on May 10, 2010.  Brown and Williams made initial contact on May 13, 2010.  At the initial contact meeting, Callahan, Brown, and Williams filled in the form entitled "RECORD OF INITIAL CONTACT," each checking the box on the form indicating that the sole reason for his visit was to "Establish INITIAL contact within 45 days of event."  During the initial contact, each of the three signed a "Notice of Rights," certifying that a counselor had explained to his satisfaction his right to choose between participation in the agency ADR program or the EO counseling process, the right to file a formal administrative complaint if not satisfied with the result of the pre-complaint counseling process, the right to be represented by counsel at all counseling interviews, and the right to bypass the EO counseling process by filing a notice of intent to sue with the EEOC.  Each was also provided with a copy of a "Notice of Evidence Required to Establish Compensatory Damages," a "Flowchart of Steps and Timeframes in the Discrimination Complaint Process," and "Sample Instructions for the Preparation of Discrimination Complaint Allegations."

EO Specialist Anthony A. Avance spoke with Brown and Callahan when they made their initial contact with the EEO.  Avance has declared that he explained to Brown and Callahan the process for pursuing a discrimination complaint, informing them that they would have to make an appointment with the EEO in order to file a pre-complaint.  According to Avance, neither Brown nor Callahan returned to the EEO for

pre-complaint processing and counseling.

EO Specialist Sabu Williams spoke with the plaintiff, George Williams, when George Williams made his initial contact with the EEO. Sabu Williams has declared that he told George Williams that if he (George Williams) decided to file a pre-complaint, he would need to return to the EEO with the information listed in the form entitled "Sample Instructions for the Preparation of Discrimination Complaint Allegations," what Sabu Williams calls the "Who, What, When, Where, How, and Why" form. George Williams never returned to the EEO for pre-complaint processing and counseling.

In opposing the Air Force's motion for summary judgment on the failure-to-exhaust issue, Williams has asserted in his declaration that he expected an investigation into his claim of age discrimination based on his initial contact with the EEO. He does not dispute the Air Force's evidence that he failed to complete and submit the Air Force's pre-complaint form. Brown has filed two declarations, in one of which he states: "I initiated EEO proceedings on May 13, 2010." Otherwise, he is silent about his attempts to exhaust his administrative remedies. In one of his two declarations, Callahan states:

> I asked for an investigation in May 2010 when I initiated contact with EEO, but I was told that an investigation was not required because I was asserting an age discrimination claim. I was not given any instructions beyond that. Further, my co-workers who were in the bargaining unit were claiming discrimination on the basis of age as well, and I believed the union was working with Eglin on the discriminatory nature of the physical test.

In a second declaration, Callahan states: "I timely initiated EEO contact and filed an informal complaint." To that second declaration, Callahan has attached a copy of a form entitled "Statement of Suspect/Witness/Complainant," a form that states it is to be

"[u]sed to record information and details of criminal activity which may require
investigative action by commanders, supervisors, security police, AFOSI special agents,
etc."  The form is dated May 13, 2010, three days after Callahan made initial contact
with the EEO, and contains a detailed statement regarding his claim of discrimination.
The form attached to Callahan's declaration is *not* the pre-complaint form used by the
Air Force EEO to process administrative complaints of discrimination, and there is no
evidence in the record to suggest that a copy of that form was ever placed in Callahan's
personnel record.

      Counsel for the plaintiffs has argued:

> At no time did the plaintiffs deprive the agency of the opportunity to
> investigate their claims. . . . [T]he agency was in possession of material
> facts appropriate for investigation in the summer of 2010 based on the
> documents submitted to this Court by both parties.  The plaintiffs objected
> to the application of the physical agility test to them as older employees,
> and documents the agency had within its grasp in June 2010 reflect that
> Lt. Col. Foley's requirements of the current employees were
> unreasonable. . . . The agency permitted Lt. Col. Foley's discriminatory
> position, inconsistent with the very documents upon which he relies in his
> declaration, to be the law of the land at Eglin Air Force Base rather than
> investigate the allegations the plaintiffs presented to the Equal
> Employment Office.  The plaintiffs have shown that they requested
> investigation of age discriminatory decisions; accordingly, the claims
> should not be dismissed.

      In an earlier ruling, this court denied the Air Force's motion for summary
judgment on the failure-to-exhaust issue, finding that the record failed to establish that
the Air Force complied with its pre-complaint obligations under section 1614.105.  The
court has now revisited that decision and has concluded, based on the entirety of the
evidence before it, that—by their mere acts of making initial contact with the
EEO—Williams and Brown did not trigger the Air Force's obligation to investigate, to

conduct a final interview, or to provide written notice of their right to file a formal administrative complaint.  It was not the Air Force that ultimately deprived Williams and Brown of the process that was due; it was Williams and Brown who simply failed to follow through and properly pursue their administrative complaints of discrimination. Thus, the Air Force is now entitled to summary judgment based on the failure of Williams and Brown to exhaust their administrative remedies.

As to Callahan, the issue is more difficult.  Callahan has submitted some evidence, albeit troubling evidence, that (1) the EEO advised him that an investigation was unnecessary because he was complaining about age discrimination, (2) the EEO gave him no instructions about what he needed to do to process an administrative complaint (he does not explain why he signed paperwork signifying that the EEO counselor *did* give him instructions about how to proceed with the administrative complaint process); and (3) he filed an "informal complaint," albeit one on a form used by law enforcement to memorialize witness and suspect statements, rather than on a form used by the EEO to process discrimination complaints.  Unlike his initial contact with the EEO, which was well-documented by the EEO, Callahan's "informal complaint" does not appear in Callahan's EEO file, and the EEO has declared that Callahan never filed an informal pre-complaint with that office.

Even when evaluating the evidence submitted in opposition to a motion for summary judgment, the court need not abandon its common sense and its real life and judicial experience.  Here, the court finds that the evidence Callahan has submitted is troubling—indeed, it defies common sense and is insufficient to overcome the Air Force's overwhelming and convincing evidence that Callahan failed in his responsibility

to fully exhaust his administrative remedies.

B.  Merits:

Even *if* the plaintiffs had properly exhausted their ADEA claims,[3] they have not

provided sufficient evidence as to the merits of their claims to survive the Air Force's

properly-supported motion for summary judgment.  To be sure, the plaintiffs have

produced the declaration of Brown, stating:

> I was told by Lt. Col. Foley in approximately February 2009 that the
> current police force for Eglin was "too old" and physically unfit to perform
> as expected and that he was implementing new standards for Eglin.  He
> said he had a "vision" of all new, young and physically fit police officers
> before he completed his tour at Eglin.

The plaintiffs have also submitted the declaration of Callahan, stating: "Major Foley

stated he had a vision of a 'young' and 'active' civilian police force."[4]  The plaintiffs

submit that this direct evidence of age discrimination precludes the entry of summary

judgment in the Air Force's favor.[5]  The court disagrees.

The federal-sector provision of the ADEA provides that "[a]ll personnel actions

affecting employees or applicants for employment who are at least 40 years of age . . .

shall be made free from any discrimination based on age."  19 U.S.C. § 633a(a).  An

---

[3]  Although the amended complaint is less than clear, it appears that the plaintiffs
have mounted disparate treatment claims and not a disparate impact claim.

[4]  Neither Johns nor Williams heard Foley make any age-related comments.

[5]  The plaintiffs also rely on the following statement included in the declarations of
Brown, Williams, Callahan, and Johns.
> "I understand that there is a new hire in her forties who is working as a
> DOD police officer in the same capacity as I and my co-plaintiffs but that
> she did not have to pass the physical test as a result of a medical
> condition."
There is nothing in the record to corroborate this "understanding" of the plaintiffs.

exception to the ADEA permits otherwise unlawful age discrimination "where the differentiation is based on reasonable factors other than age [RFOA"]."  Id. at § 623(f)(1); see also Meacham v. Knolls Atomic Power Lab., 554 U.S. 84, 102 (2008) (noting that "Congress took account of the distinctive nature of age discrimination, and the need to preserve a fair degree of leeway for employment decisions with effects that correlate with age, when it put the RFOA clause into the ADEA, significantly narrowing its coverage") (internal quotation marks, alteration, and citation omitted); Barnes v. Sw. Forest Indus., Inc., 814 F.2d 607, 611 (11th Cir. 1987) (noting that "Congress made plain that the age statute was not meant to prohibit employment decisions based on factors that sometimes accompany advancing age, such as declining health or diminished vigor and competence") (internal quotation marks omitted).

In Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009), the United States Supreme Court held that, in a disparate treatment case under the ADEA, "[a] plaintiff must prove, by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but for' cause of the challenged employer decision." Id. at 177-78.  "The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision."  Id. at 180.

Here, the record establishes that, in 2009, the Department of Defense adopted a neutral-on-its-face policy with respect to physical fitness standards for civilian police and security guards in all branches of the military.  Consistent with that policy and as directed by the DOD, the Department of the Air Force, and not Elgin AFB, developed what it considered to be minimum physical fitness standards needed for civilian police

officers and security guards of all ages in all installations to be able to perform their
unique duties.  Foley was not involved in the promulgation of the DOD policy or in the
adoption—pursuant to that policy—of the Air Force's PAT.

Foley was instead charged with implementing the PAT during his two-year stint
at Eglin AFB.  As directed, Foley implemented the PAT immediately for new hires and
for incumbents holding temporary positions pursuant to the GWOT authority.  Also as
directed, he delayed implementation for bargaining-unit employees until bargaining-unit
obligations could be met.  Foley was unsure when and how to implement the PAT with
respect to employees who—like the plaintiffs in this case—were not new hires,
incumbents hired pursuant to GWOT authority, or bargaining-unit employees.  Initially,
neither the DOD nor the Air Force had addressed when or how the PAT should be
implemented with respect to these individuals.  Recognizing that all civilian police
officers and security guards would ultimately be required to comply with the newly-
adopted standards, and seeing no reason to delay implementation for non-bargaining-
unit employees, Foley asked for and received permission from headquarters to
implement the PAT for incumbent non-bargaining unit employees, including the
plaintiffs.  Foley thereafter advised the plaintiffs (and others in similar positions) that
they would have six months in which to satisfactorily complete the PAT or face
termination.

Before Foley left Eglin in June of 2010, Johns and Brown chose to retire rather
than face termination.  For medical reasons, Callahan and Williams were given extra
time to satisfy the physical fitness standards.  When—several months after Foley's
departure—it became apparent that Callahan and Williams would never be able to

complete the PAT, Callahan and Williams were advised that they could choose retirement or termination.  They both chose retirement.

Here, despite Foley's alleged comments about wanting a "young" and fit police force,[6] the court finds that the plaintiffs have not established a genuine issue of material fact with respect to their ultimate burden of proof: namely, that age was the "but for" reason for the adverse actions taken against them.  Indeed, the evidence establishes that the plaintiffs were removed from their supervisory police positions, not because of some discriminatory animus of Foley's, but because they could not complete a PAT that was being implemented service-wide to ensure that officers could perform the essential functions of their jobs "in a safe and effective manner without posing a risk to themselves, others or the law enforcement mission."  Whether it was Brown and Johns, who were "forced" into retirement during Foley's tenure, or Callahan and Williams, who were "forced" into retirement by Foley's replacement, the plaintiffs have not shown that the Air Force would have kept them on the job but for their age.  In sum, the weak inference of age bias raised by the alleged comments of one Air Force officer about wanting a "young" and fit police force simply cannot carry the plaintiffs' burden in light of the other substantial and uncontroverted record evidence regarding the nondiscriminatory reasons for implementation of the PAT.

Accordingly, it is ORDERED:

1.  The Air Force's motion (doc. 70) to dismiss or, in the alternative, for summary judgment is GRANTED.

_____

[6]  These comments, which Foley has denied, are deemed true for purposes of the Air Force's motion for summary judgment.

2.  The clerk shall enter judgment stating: "All claims are DISMISSED WITH

PREJUDICE."

3.  Costs shall be taxed against the plaintiffs.

DONE AND ORDERED this ___11th___ day of _____February_____, 2013.


s/ William Stafford_____
WILLIAM STAFFORD
SENIOR UNITED STATES DISTRICT JUDGE